**In re John W. WHATLEY, Ruby L. Whatley and Whatley Farms, Inc.**

**No. 84–40073.**

United States Bankruptcy Court, N.D. Mississippi.

Jan. 18, 1991.

George F. Hollowell, Jr., Greenville, Miss., for John W. and Ruby L. Whatley.

Pat H. Scanlon and Gretchen Pumphrey, Young, Scanlon and Sessums, Jackson, Miss., for Guar. Bank and Trust Co.

Patricia D. Rogers, Asst. U.S. Atty., N.D. Miss., Oxford, Miss., for U.S. of America for and on behalf of Small Business Ass'n.

## OPINION

DAVID W. HOUSTON, III,
Bankruptcy Judge.

On consideration before the Court is the motion to compel Guaranty Bank and Trust

Co. to make a final accounting and turn over proceeds of the sale of collateral, filed by the United States Attorney for the Northern District of Mississippi, for and on behalf of the Small Business Administration (SBA); response to said motion having been filed by Guaranty Bank and Trust Co., hereinafter referred to as Guaranty Bank or Bank; and the Court having heard and considered same, hereby finds, orders and adjudicates as follows, to-wit:

## I.

Guaranty Bank and SBA originally litigated their lien priority dispute concerning the debtors' farm equipment in this Court in a non-core adversary proceeding. The Court held that the lien of Guaranty Bank enjoyed priority over that of SBA. The effect of this decision was not stayed pending appeal by SBA. The decision was affirmed by the United States District Court for the Northern District of Mississippi, but reversed and rendered by the Fifth Circuit Court of Appeals.

Before the appeal was concluded, the bankruptcy case was converted from Chapter 11 to Chapter 7 of the Bankruptcy Code. Shortly thereafter, Guaranty Bank filed a motion seeking dismissal of the case. An agreed order, disposing of this motion, was entered after being approved by Guaranty Bank's attorney, the Assistant United States Attorney representing SBA, and the debtors' attorney. A portion of this order, which is pertinent to the instant proceeding, reads as follows:

> IT IS ACCORDINGLY, ORDERED AND ADJUDGED that the automatic stay provisions of Section 362 be, and the same are modified and lifted as to the collateral of Guaranty Bank & Trust Company, and the said Guaranty Bank & Trust Company, Belzoni, Mississippi, is hereby authorized to immediately take possession of said collateral and to realize upon said collateral in such a manner as it deems necessary and proper including, but not limited to, foreclosure, as provided by said Guaranty Bank & Trust Company's Security Agreements, all without further Order of this Court, provided, however, *that the funds so received from any foreclosure sale of this property shall be placed in the interest bearing escrow account at Guaranty Bank & Trust Company* pending the outcome of the appeal of the Small Business Administration to the United States District Court for the Northern District of Mississippi. (emphasis added.)

Guaranty Bank noticed the foreclosure sale by posting public notices and also by sending copies of the notice to local equipment dealers, the debtors' attorney, and the attorney representing SBA. The notice was received by SBA on September 2, 1987, as evidenced by its file stamp. The foreclosure sale was conducted by Guaranty Bank's attorney, during legal hours, on September 10, 1987.

Prior to the sale, Guaranty Bank had the farm equipment appraised by Jerry Mitchell, an employee of Yokley and Lundy Auction Company, who estimated that the equipment ranged in value from $40,000.00 to $55,000.00. His appraisal worksheet, which reflected his evaluation of the individual items, reflected a total value of between $40,312.50 and $42,000.00. (See Defendant's Exhibit No. 1.)

After receiving the appraisal, Guaranty Bank calculated its foreclosure bid as follows:

| | | |
|---|---:|---:|
| Low end of appraisal range | | $40,000.00 |
| Less: Value of assets not included in foreclosure | $8,500.00 | |
| Batteries and clean-up | 1,500.00 | |
| Repair work | 200.00 | |
| Hauling | 2,500.00 | |
| Sales commission | 2,300.00 | |
| | | $15,000.00 |
| Foreclosure bid | | $25,000.00 |

Mitchell testified, without contradiction, that he thought that this bid was reasonable under the circumstances.

At the foreclosure sale, Guaranty Bank was the only bidder and purchased the equipment for the $25,000.00 bid price. Pursuant to the provisions of the court order, this amount was deposited into an interest bearing account.

The following day, Guaranty Bank put the equipment in an auction sale being conducted by Yokley and Lundy in the Stringtown Community. According to Mitchell, the equipment was sold "without reservation," which essentially means that the equipment would not be pulled from the sale and Guaranty Bank would take whatever price the equipment brought. The equipment was auctioned and Guaranty Bank received net proceeds in the sum of $39,748.29, representing gross sales proceeds of $46,202.50, less related expenses and commissions totaling $6,454.21.

Following the reversal of the Bankruptcy Court and District Court decisions by the Fifth Circuit, Guaranty Bank paid SBA the $25,000.00 price that it had bid at the foreclosure sale, plus accrued interest in the sum of $2,848.11, or a total payment of $27,848.11.

The question before the Court at this time is whether Guaranty Bank should be permitted to retain the difference in the price that it paid at the foreclosure sale and the amount that it received at the auction sale, an alleged "profit" totaling $14,748.29 ($39,748.29 less $25,000.00). Three underlying issues have been raised concerning this question, to-wit:

1. Whether Guaranty Bank owed a fiduciary duty to SBA in disposing of the farm equipment.

2. Whether Guaranty Bank's foreclosure sale of the equipment met the commercial reasonableness standard of § 75–9–504, Miss.Code Ann.

3. Whether equity dictates that Guaranty Bank pay over the excess proceeds received at the auction sale to SBA.

## II.

■ The first issue that must be addressed is whether Guaranty Bank owed a fiduciary duty to SBA in the disposition of the debtors' farm equipment. The Court has reviewed all the cases cited by SBA and finds them factually distinguishable from the instant proceeding. The order of the Bankruptcy Court, lifting the automatic stay so that Guaranty Bank could exercise its state law rights of foreclosure, did not impose fiduciary obligations on Guaranty Bank for the benefit of SBA. The only duties imposed on Guaranty Bank, implicitly or otherwise, were to conduct the foreclosure sale in a commercially reasonable manner and to account for the sale proceeds by depositing them into an interest bearing account. There is simply no authority to impose a more expansive duty on Guaranty Bank. See, *Wansley v. First National Bank of Vicksburg*, 566 So.2d 1218 (Ms.1990). Therefore, the Court rejects the argument of SBA that Guaranty Bank was placed in a fiduciary position insofar as SBA's interest in the debtors' farm equipment is concerned.

## III.

The next issue that must be addressed is whether Guaranty Bank conducted the foreclosure sale in a commercially reasonable manner. In this context, three subsections of the Mississippi Code should be examined, to-wit:

Sections 75–9–504(3) and (4), Miss.Code Ann., provide the following:

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one (1) or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type

customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods, no other notification need be sent. In other cases, notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale; and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made, and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this Part or of any judicial proceedings

(a) in the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or

(b) in any other case, if the purchaser acts in good faith.

Section 75-9-507(2), Miss.Code Ann., provides as follows:

(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two (2) preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.

The net effect of the above Code sections can be easily summarized: (1) Guaranty Bank must conduct its foreclosure sale in a commercially reasonable manner; and (2) the fact that the property might have brought a better price at a sale conducted at a different time or by a different method is not conclusive that the foreclosure sale was not conducted in a commercially reasonable manner.

In this proceeding, Guaranty Bank based its foreclosure bid on the appraisal that it had received from Yokley and Lundy. The appraiser's worksheet, which reflected his evaluation for each item of equipment, indicated a total value for the equipment of between $40,312.50 and $42,000.00, although he did express that the equipment could have a value range of between $40,000.00 to $55,000.00. The commission and expenses estimated by Guaranty Bank were almost identical to the total amount of the actual commission and expenses incurred. ($6,500.00 compared to $6,454.21) As mentioned earlier, the Yokley and Lundy appraiser considered the foreclosure bid price calculated by Guaranty Bank to be reasonable under the circumstances. The sale was noticed in keeping with customary standards of practice and in compliance with the requirements of the Mississippi Uniform Commercial Code.

SBA was appropriately advised of the sale in a timely manner, but elected not to attend or bid on the property. From the evidence presented at the hearing, the Court is compelled to conclude that the foreclosure sale was conducted in a commercially reasonable manner. The fact that the auction sale enabled Guaranty Bank to receive an excess of $14,748.29, over and above the price it paid at the foreclosure sale, is not conclusive that the foreclosure sale was not conducted in a commercially reasonable manner. The argument of SBA as to this issue is not well taken.

### IV.

■ The last issue to be considered is whether equity requires Guaranty Bank to pay SBA the excess "profit" of $14,748.29 since SBA was ultimately found by the Fifth Circuit to have had a superior lien to that of Guaranty Bank.

In this context, the Court is fully convinced that the purchase of the equipment at foreclosure followed by the subsequent sale at auction was not a contrived scheme by Guaranty Bank to profit at the expense of SBA. At the time of these transactions, Guaranty Bank thought that it had legitimate title to the equipment, particularly since it had prevailed over SBA in the Bankruptcy Court and District Court litigation.

Guaranty Bank had been told by Yokley and Lundy that it had to have legal title to the equipment if the equipment was going to be placed in the auction sale. When SBA, although noticed in ample time, did not appear and bid at the foreclosure sale, Guaranty Bank had no choice but to acquire title in its name. Guaranty Bank then assumed all risks associated with the auction sale by putting the equipment in the sale "without reservation." This, of course, included the responsibility of paying the auctioneer's commission and the other expenses necessarily incurred in connection with the sale. SBA, or any other party, was free to pursue the same course of action followed by Guaranty Bank. There was clearly no stay pending appeal of the original decision of this Court or of the District Court. The agreed order entered on August 29, 1987, protected SBA only to the extent of any proceeds realized at foreclosure, not to any subsequent events. Once Guaranty Bank purchased the property at foreclosure, the lien rights of SBA were terminated except to the foreclosure proceeds.

Indeed, Guaranty Bank was fortunate to receive more from the auction sale than it had paid at foreclosure. It could well have received less. SBA appears to be viewing these transactions with "20/20 hindsight." The Court seriously doubts that SBA would be willing to take less than the $25,000.00 foreclosure bid, had the auction sale netted something less than that for Guaranty Bank. In this proceeding, equity is simply on the side of Guaranty Bank.

Therefore, the Court concludes that the position of SBA is not well taken. Its motion to compel Guaranty Bank to make a final accounting and to turn over the excess proceeds realized at the auction sale of the farm equipment will be overruled. SBA was protected by this Court's order, entered on August 29, 1987, only to the extent of the proceeds generated at the foreclosure sale plus any interest accruing thereafter. This obligation was satisfied when Guaranty Bank paid SBA the sum of $27,848.11.

An Order will be entered consistent with this Opinion.